# EXHIBIT 5

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the          )
Life Term Plus One Year       )
Parole Consideration          )
Hearing of:                   )          CDC Number C-50493
                              )
WILBUR MCCLORE                )
                              )
_____ )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 12, 2005

3:25 P.M.

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Ms. D.H. McBean, Deputy Commissioner

OTHERS PRESENT:

Mr. Wilbur Mcclore, Inmate
Ms. Katera Rutledge, Attorney for Inmate
Mr. Jack Delavigne, Deputy District Attorney for
Los Angeles County
Correctional Officer Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

**TIFFANY BILLINGSLY, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 8 |
| Post-Commitment Factors | 22 |
| Parole Plans | 19 |
| Closing Statements | 34 |
| Recess | 38 |
| Decision | 39 |
| Adjournment | 43 |
| Transcriber Certification | 45 |

--oOo--

1

1       **P R O C E E D I N G S**

2           **PRESIDING COMMISSIONER FISHER:** All right.

3    This is going to be a subsequent parole

4    consideration hearing for Wilbur McClore, CDC

5    No. C-50493, today's date is 9-12-05 and we're

6    located at Correctional Training Facility at

7    Soledad. Inmate was received on 12-6-87 from Los

8    Angeles County. The life term began on 4-6-87

9    and the minimum eligible parole date is 4-4-93.

10   The controlling offense which the inmate has

11   been committed is kidnap for robbery. Case No.

12   A811397, Count 1, Penal Code Section 209b.

13   Inmate received a term of life plus one-year.

14   Once again, the minimum eligible parole date is

15   4-4-93. Mr. McClore, we're going to be tape

16   recording today so for the transcriber, we're

17   each going to say our first and last name and

18   spell our last name. When I get to you, I need

19   your CDC Number, all right? I'm going to start

20   with myself and go to my left. Susan Fisher, F-

21   I-S-H-E-R, Commissioner.

22           **DEPUTY COMMISSIONER MCBEAN:** I'm DH

23   McBean, M-C-B-E-A-N, Deputy.

24           **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** I'm

25   Jack Delavigne, D-E-L-A-V-I-G-N-E, Deputy

26   District Attorney, L.A. County.

27           **ATTORNEY RUTLEDGE:** Katera E. Rutledge,

2

1  Attorney for Mr. McClore.

2      **INMATE MCCLORE:** McClore, C-50493. M-C-C-

3  L-O-R-E.

4      **PRESIDING COMMISSIONER FISHER:** Miss

5  Rutledge, did you talk to Mr. McClore about the

6  Americans with Disabilities Act?

7      **ATTORNEY RUTLEDGE:** Yes.

8      **PRESIDING COMMISSIONER FISHER:** And does

9  he have anything that we need to accommodate

10  today?

11      **ATTORNEY RUTLEDGE:** He's accommodated for.

12      **PRESIDING COMMISSIONER FISHER:** All right.

13  I do want to note for the record that on January

14  4th of this year, Mr. McClore did sign the BPT

15  1073 form, you noted something about having a

16  walking problem, is that correct?

17      **INMATE MCCLORE:** Yes.

18      **PRESIDING COMMISSIONER FISHER:** Okay.

19  What's it from?

20      **INMATE MCCLORE:** From being shot.

21      **PRESIDING COMMISSIONER FISHER:** Oh.

22  That'll do it, won't it.

23      **INMATE MCCLORE:** You got that right.

24      **PRESIDING COMMISSIONER FISHER:** Okay. And

25  so do you have to use any kind of -- do you use

26  a cane or anything?

27      **INMATE MCCLORE:** I used to, I come off of

3

1  it just now.

2      **PRESIDING COMMISSIONER FISHER:** Have you,

3  okay. How you doing?

4      **INMATE MCCLORE:** Doing okay.

5      **PRESIDING COMMISSIONER FISHER:** Okay. Are

6  you in any pain?

7      **INMATE MCCLORE:** Little bit.

8      **PRESIDING COMMISSIONER FISHER:** Well, if

9  you get uncomfortable, if you need to stretch or

10  move around or anything, let me know, all right?

11      **INMATE MCCLORE:** All right.

12      **PRESIDING COMMISSIONER FISHER:** Okay. This

13  hearing is being conducted pursuant to Penal

14  Code Sections 3041 and 3042 and the rules and

15  regulations of the Board of Prison Terms that

16  govern parole considerations for life inmates.

17  And as you know Mr. McClore, the purpose of

18  today's hearing is to consider your commitment

19  offense, your prior criminal and social history

20  and your behavior and programming since he's

21  been in prison for this offense. We've had the

22  opportunity to review your file. I'm going to

23  give your attorney the opportunity today to make

24  any corrections that you need to. We're going to

25  be reaching a decision today as to whether or

26  not we find you suitable for parole. If we do

27  find you suitable for parole, if we do find you

4

1    suitable, I'll explain to you how much longer

2    you will be in prison. Before we recess to

3    deliberate, I'm going to give you and you're

4    attorney as well as the District Attorney an

5    opportunity to make a final statement about your

6    suitability. I want to remind you that you're

7    not required to admit or discuss the offense but

8    that the Panel accepts the findings of the Court

9    to be true. Do you understand that?

10          **INMATE MCCLORE:** Yes.

11          **PRESIDING COMMISSIONER FISHER:** Okay. The

12   California Code of Regulations states that

13   regardless of the time served, the life inmate

14   should be found unsuitable for and denied

15   parole, if in the judgment of the Panel, the

16   inmate would pose an unreasonable risk of danger

17   to society if released from prison. You have

18   rights related to this hearing, including a

19   timely notice in the hearing; a right to review

20   your Central file; the right to present relevant

21   documents. Counsel, have your client's rights

22   been met?

23          **ATTORNEY RUTLEDGE:** Yes.

24          **PRESIDING COMMISSIONER FISHER:** All right.

25   You also have a right to an impartial Panel.

26   Counsel, do you have any objections to the

27   Panel?

5

1          INMATE MCCLORE: No.

2          PRESIDING COMMISSIONER FISHER: Counsel,

3   do you have any objections to the Panel?

4          ATTORNEY RUTLEDGE: None.

5          PRESIDING COMMISSIONER FISHER: Okay, I'm

6   going to give you a written copy of the decision

7   today. It's going to be a tentative decision,

8   it's going to be effective within 120 days. And

9   then a copy of the decision and a copy of the

10  transcript of the hearing will be sent to you.

11  They changed the way they appeal Board decisions

12  last year and now all the appeals go directly to

13  the Courts. So if you need information about

14  that, you responded as if you don't, but if you

15  need information about that, your correctional

16  counselor would have that or it would be in the

17  prison library. Counsel, is there anything that

18  needs to be submitted?

19         ATTORNEY RUTLEDGE: Yes Commissioner, we

20  have one letter addressed to Mr. McClore for the

21  Board of Parole Hearings, where he sought

22  assistance in helping him adjust to parole.

23         PRESIDING COMMISSIONER FISHER: All right.

24  Thank you. Mr. Delavigne, I didn't hear if you

25  have everything.

26         DEPUTY    DEPUTY    DISTRICT    ATTORNEY

27  DELAVIGNE: I do.

6

1    **PRESIDING    COMMISSIONER    FISHER:**    Okay.

2    Thank    you.    Counsel,    do    you    have    everything

3    there?

4        **ATTORNEY  RUTLEDGE:**  I'm  not  sure  I  have

5    the    sentencing    transcript,    I    have    what    looks

6    like trial  transcript,  but  not  a  sentencing,  let

7    me look through for just a minute.

8        **PRESIDING  COMMISSIONER  FISHER:**  They  may

9    have just miss-marked it.

10       **ATTORNEY  RUTLEDGE:**  I  would  just  note  that

11   for the record, we have what appears to be trial

12   testimony    or    even    preliminary    examination

13   testimony?

14       **PRESIDING COMMISSIONER FISHER:** All right.

15   Thank you. Any preliminary objections?

16       **ATTORNEY  RUTLEDGE:**  We  would  object  if  the

17   Panel is going over these probation reports. It

18   looks like the appellate decision based upon the

19   transcript  from  the  trial  appears  to  be  more

20   accurate than the probation report.

21       **PRESIDING    COMMISSIONER    FISHER:**    For    the

22   summary?

23       **ATTORNEY  RUTLEDGE:**  For  the  summary,  yes.

24       **PRESIDING    COMMISSIONER    FISHER:**    Okay.    I

25   actually had that one marked, so that's the one

26   we're  going  to  be  using.  All  right.  Is  Mr.

27   McClore going to be speaking with us?

7

1       **ATTORNEY RUTLEDGE**: Yes.

2       **PRESIDING COMMISSIONER FISHER**: If you

3   will raise your right hand, I'm going to swear

4   you in. Do you solemnly swear that the testimony

5   that you give at this hearing will be the truth,

6   the whole truth and nothing but the truth?

7       **INMATE MCCLORE**: Yes.

8       **PRESIDING COMMISSIONER FISHER**: Okay. Mr.

9   McClore, what I'm going to do is read a summary

10  of the crime into the record and I'm just going

11  to ask you to tell me in your own words what

12  happened. All right? If this is mostly accurate,

13  we can kind of go from there. And this is page 2

14  of the Appellate Decision and it reads as

15  follows:    It    was    established    that    at

16  approximately 11:00a.m. on November 25, 1985,

17  Kristi Boucher was about to get out of her car

18  in the parking lot of a Wendy's restaurant, a

19  man came up to her, opened car door and demanded

20  her purse and money. When she responded she did

21  not have a purse, the man struck her across the

22  face  and  forced  her  by  the  neck  into  the

23  passenger seat. Boucher gave the man her keys

24  and told him her purse was in the trunk. When

25  the man opened the trunk, Boucher saw appellant

26  outside the passenger door to her car. Appellant

27  entered  the  passenger  side  and  the  other  man

8

1   entered the car on the driver's side and pushed
2   Boucher into the back seat. When she told the
3   men, "take my car, take everything, just let me
4   out," one of the men responded, "Just sit back,
5   we're going for a ride" as they drove, appellant
6   went through Boucher's purse, taking money from
7   her wallet. Appellant demanded that she write
8   out a check for $200 dollars and give it to him.
9   Appellant ripped a necklace from her neck, took
10  the rings from her fingers and her watch. After
11  she and her kidnappers went to two stores, where
12  they forced her to buy shoes and clothing for
13  them. Hours later, the men released Boucher on
14  the side of the freeway. All right. I think that
15  pretty much covers the summary of the crime. Is
16  that correct?
17      **INMATE MCCLORE:** Yes.
18      **PRESIDING COMMISSIONER FISHER:** Okay. And
19  why? Why did that happen? What made you decide
20  that it was a good idea to take this lady's
21  money and her car and make her go shop for you?
22      **INMATE MCCLORE:** Well, at the time I was
23  just stressing and being foolish, not having a
24  job at the time and I needed the money. But
25  everything you just said is correct. I'm not
26  here to change any facts dealing with the case.
27      **PRESIDING COMMISSIONER FISHER:** Okay. I'm

9

1    just trying to get into what you were thinking

2    at the time, more than whether or not you want

3    to change the facts. I just don't, the thing

4    that sort of caught my attention was, making her

5    go shopping for you. Why not just grab her money

6    and take off, I mean, you took her in the car,

7    you made her go buy you clothes and shoes and

8    stuff?

9        **INMATE MCCLORE:** Right. Because she didn't

10   have no money. So, she had a credit card, so

11   that's what the reason was to go to the stores.

12       **PRESIDING COMMISSIONER FISHER:** Okay. All

13   right. How did you get arrested?

14       **INMATE MCCLORE:** I got arrested, I was

15   driving with another guy in the car and I think

16   he ran a stop sign, a red light or something

17   like that, and officers came and gave him a

18   ticket for running the light and described me

19   from this case.

20       **PRESIDING COMMISSIONER FISHER:** Is there

21   anything else about what happened that day that

22   you and I haven't talked about as far as the

23   details of how the crime happened or why the

24   crime happened, or what was going on during the

25   crime that we haven't covered?

26       **INMATE MCCLORE:** You covered everything.

27   Everything is correct.

10

1          **PRESIDING COMMISSIONER FISHER:** All right.
2    I'm going to talk about your prior social
3    history, I'm going to start with any prior
4    contacts with law enforcement. Just looking at
5    the Board report here, and it says that there's
6    no prior juvenile record, it says that you were
7    arrested in '79 for robbery and released, it
8    says detention only. How old were you in '79?
9    That's always the hardest question for
10   everybody. What year were you born?

11         **INMATE MCCLORE:** 1956. July 3rd.

12         **PRESIDING COMMISSIONER FISHER:** So, you
13   must have been 23, right?

14         **INMATE MCCLORE:** Yes.

15         **PRESIDING COMMISSIONER FISHER:** Okay. Then
16   you were arrested again in '82 for theft,
17   receiving stolen property and burglary and you
18   went to prison for that?

19         **INMATE MCCLORE:** Yes.

20         **PRESIDING COMMISSIONER FISHER:** How long
21   were you actually in prison for that?

22         **INMATE MCCLORE:** It was a 2-year sentence.
23   I think I did 13 months on that I believe.

24         **PRESIDING COMMISSIONER FISHER:** And then
25   you were arrested for what is actually the non-
26   controlling offense in this particular
27   commitment and that was for assault with a

11

1  deadly weapon; right?

2       **INMATE MCCLORE:** Yes.

3       **PRESIDING COMMISSIONER FISHER:** Okay. And

4  that was on 3-22-84 that was a different case

5  number that was case number A807032 that was

6  count 1. What happened? What was that?

7       **ATTORNEY RUTLEDGE:** We're going to ask,

8  because I talked to Mr. McClore about this

9  incident, there's lots of questions we have that

10 we can't document, for example, the assault with

11 a deadly weapon, the injuries, he would like to

12 speak on that, but we can't at this point

13 because we don't have the documents that would

14 back up his statements. There doesn't appear to

15 be any information as to whether there were

16 injuries or anything that would support the 245.

17       **PRESIDING COMMISSIONER FISHER:** Well,

18 according to the information I have in the file,

19 the weapon was a telephone; is that right?

20       **ATTORNEY RUTLEDGE:** Yes. That was a fact,

21 as stated in the report.

22       **PRESIDING COMMISSIONER FISHER:** Okay. This

23 had to do with, you were pimping?

24       **INMATE MCCLORE:** No.

25       **PRESIDING COMMISSIONER FISHER:** You

26 weren't pimping?

27       **INMATE MCCLORE:** No. I wasn't found guilty

12

1   of that.

2           **PRESIDING COMMISSIONER FISHER:** Okay.

3           **ATTORNEY RUTLEDGE:** That was dismissed at

4   trial.

5           **INMATE MCCLORE:** yes.

6           **PRESIDING COMMISSIONER FISHER:** I know

7   that was dismissed at trial, but I'm reading the

8   circumstance of the offense and it says that you

9   were forcing her, you were trying to force her

10  into prostituting for you. All right. We'll move

11  on. Let's talk about your social history. It

12  says that you are the fifth of six kids, is that

13  right?

14          **INMATE MCCLORE:** Yes ma'am.

15          **PRESIDING COMMISSIONER FISHER:** All right.

16  Four brothers and one sister?

17          **INMATE MCCLORE:** yes.

18          **PRESIDING COMMISSIONER FISHER:** According

19  to this, your parents are both deceased, what

20  about your brothers and sister, are they all

21  still alive?

22          **INMATE MCCLORE:** Yes.

23          **PRESIDING COMMISSIONER FISHER:** And are

24  you in contact with them?

25          **INMATE MCCLORE:** Yes.

26          **PRESIDING COMMISSIONER FISHER:** Okay good.

27  Did you grow up in Tennessee?

13

1           **INMATE MCCLORE:** Yes.

2           **PRESIDING COMMISSIONER FISHER:** Memphis?

3           **INMATE MCCLORE:** Yes.

4           **PRESIDING COMMISSIONER FISHER:** It looks

5     like -- it says your family lives outside the

6     state of California, are a lot of them still in

7     Tennessee?

8           **INMATE MCCLORE:** I have one brother still

9     in Tennessee.

10          **PRESIDING COMMISSIONER FISHER:** What about

11    the others, where are they?

12          **INMATE MCCLORE:** My sister passed away,

13    that's my only sister. And I have a brother that

14    live in Alabama, my youngest brother and then I

15    have two brothers that live in Texas, in

16    Houston.

17          **PRESIDING COMMISSIONER FISHER:** So they're

18    sticking to the South, huh.

19          **INMATE MCCLORE:** Oh yea.

20          **PRESIDING COMMISSIONER FISHER:** All right.

21    It says that you've never been married but that

22    you have two sons, is that right?

23          **INMATE MCCLORE:** yes.

24          **PRESIDING COMMISSIONER FISHER:** Do they

25    both have the same mom?

26          **INMATE MCCLORE:** No.

27          **PRESIDING COMMISSIONER FISHER:** So, what

14

1    have you done to contribute to their well being

2    while you've been here, anything?

3           INMATE MCCLORE: Well, I write them, and

4    call them and if I have some extra money from my

5    pay or whatever, I send them it.

6           PRESIDING COMMISSIONER FISHER: Do you?

7    All right. No substance abuse history at all?

8           INMATE MCCLORE: No.

9           PRESIDING COMMISSIONER FISHER: It says

10   that you drank alcohol a little bit, but just on

11   social occasions. Right?

12          INMATE MCCLORE: Yes.

13          PRESIDING COMMISSIONER FISHER: So, what

14   was going on in your life, because it says you

15   had numerous jobs before you were incarcerated,

16   worked at different kinds of things, how come

17   you were taking other people's money?

18          INMATE MCCLORE: I just went bad. Got off

19   track.

20          PRESIDING    COMMISSIONER    FISHER:    Okay.

21   That's a simple answer.

22          INMATE MCCLORE: Yes.

23          PRESIDING COMMISSIONER FISHER: When did

24   you get off-track?

25          INMATE MCCLORE:    I think when I first

26   caught that first burglary case, yes.

27          PRESIDING COMMISSIONER FISHER: In '79?

15

1          **INMATE MCCLORE:** Yes.

2          **PRESIDING COMMISSIONER FISHER:** Oh wait,

3    '79 was a robbery, '82 was the burglary.

4          **INMATE MCCLORE:** I wasn't found guilty of

5    the robbery, they just let me go. Cuz it wasn't

6    none of us.

7          **PRESIDING COMMISSIONER FISHER:** Okay. So,

8    the burglary in '82, how did you get involved in

9    that?

10          **INMATE MCCLORE:** The burglary?

11          **PRESIDING COMMISSIONER FISHER:** Yea. Were

12    you by yourself?

13          **INMATE MCCLORE:** No.

14          **PRESIDING COMMISSIONER FISHER:** Somebody

15    was with you?

16          **INMATE MCCLORE:** Right.

17          **PRESIDING COMMISSIONER FISHER:** Was it the

18    same guy that was involved in this?

19          **INMATE MCCLORE:** No.

20          **PRESIDING COMMISSIONER FISHER:** So, did

21    you just kind of go along with people when they

22    wanted to commit crimes?

23          **INMATE MCCLORE:** Actually yea, I was young

24    and foolish, you know. I was influenced, I just

25    went along with it.

26          **PRESIDING COMMISSIONER FISHER:** So, how

27    old are your son's now?

16

1       **INMATE MCCLORE:** Okay. Sky, he would have

2  to be about 27. Demetris is 19.

3       **PRESIDING COMMISSIONER FISHER:** And where

4  are they --

5       **INMATE MCCLORE:** Long Beach University,

6  Demetris, he's living in Palmdale with his

7  mother and he's going to Long Beach University.

8  Sky, he still lives in Austin, Texas with his

9  mother. He's working in Texas.

10      **PRESIDING COMMISSIONER FISHER:** What's

11  Demetris studying? What's he going to be when

12  grows up?

13      **INMATE MCCLORE:** Well, I don't really talk

14  to him too much like that, no.

15      **PRESIDING COMMISSIONER FISHER:** Do you

16  talk to him very often?

17      **INMATE MCCLORE:** No, not often, just

18  sometimes.

19      **PRESIDING COMMISSIONER FISHER:** What about

20  the other one, Sky, do you talk to him?

21      **INMATE MCCLORE:** Yes, he's working in

22  Texas, he's truck driving.

23      **PRESIDING COMMISSIONER FISHER:** so they

24  didn't follow in your footsteps?

25      **INMATE MCCLORE:** That's good.

26      **PRESIDING COMMISSIONER FISHER:** Anything

27  else about your life before you came to prison

17

1   for this crime that you and I haven't talked

2   about that you think we should know?

3          **INMATE MCCLORE:** No, not really.

4          **PRESIDING COMMISSIONER FISHER:** Okay. All

5   right. Let's talk about your parole plans. In

6   the file here, it says that you lived with your

7   friend, and I think it's pronounce Coleen, is

8   that right?

9          **INMATE MCCLORE:** I've been working with

10  her at the beauty salon.

11         **PRESIDING COMMISSIONER FISHER:** And then

12  it says that you can also stay with a friend

13  from Morgan Pat Hill.

14         **INMATE MCCLORE:** Right.

15         **PRESIDING COMMISSIONER FISHER:** And then

16  there's a cousin, is it Tabitha? You're cousin

17  that's offering you a place to stay?

18         **INMATE MCCLORE:** Yes.

19         **PRESIDING COMMISSIONER FISHER:** Let's see

20  what else we got here, and of course, it says

21  you have a place in Tennessee you could stay.

22  Now, I've got this letter --

23         **INMATE MCCLORE:** I have another place too,

24  in Los Angeles County.

25         **PRESIDING COMMISSIONER FISHER:** Okay, and

26  who's that with?

27         **INMATE    MCCLORE:**    My    brother    and

18

1    (Indiscernible) Kimbal.

2         **PRESIDING COMMISSIONER FISHER:** Okay. And

3    do we have a letter from her?

4         **INMATE MCCLORE:** Right here.

5         **PRESIDING   COMMISSIONER   FISHER:**   Okay.

6    Good, and I may have it in the file too. But

7    let's just take a look at it, just to be sure

8    and get it on the record. All right. Is this

9    your first choice? Is this the one that you

10   want.

11        **INMATE MCCLORE:** Yes. This is closest to

12   my job, you know, where I be working at.

13        **PRESIDING COMMISSIONER FISHER:** I'm going

14   to spell her name for the transcriber, it's

15   Shavela Kimball. She says she lives in Valley

16   Glenn which is a subsidiary of Sherman Oaks and

17   it says, "I'm writing this letter in support of

18   W McClore. Will is one of my favorite uncles and

19   I can't wait till the day when I spend some

20   quality time with him and catch up, it's my

21   understanding that he already has employment

22   lined up and is eager to get back into society

23   and make a living for himself. I feel he's paid

24   his debt for a long time and now would be an

25   opportunity to give him a second chance to give

26   back." And she says that she will be there for

27   whatever you need. And she gives us her contact

19

1  information. I think we have a lot of letters

2  and I'm not going to read them all, but I did

3  look to see if there were some in particular

4  that you think would be important for me to put

5  on the record other than to just note that you

6  have lots and lots of letters of support. Is

7  there anyone in particular that you think would

8  be important for us to read a whole letter or

9  parts of the letter on?

10         **ATTORNEY RUTLEDGE:** I think there's a

11  letter in there Theresa Hill?

12         **PRESIDING COMMISSIONER FISHER:** Okay. I've

13  got a Patricia Hill here. Is that the letter

14  you're talking about?

15         **ATTORNEY RUTLEDGE:** That letter and just

16  the support letter from the job offers and that

17  letter would be most important.

18         **PRESIDING COMMISSIONER FISHER:** Okay. This

19  is from Brenard and Patricia Hill. It says,

20  "We're writing this letter on behalf of Mr.

21  McClore in hopes of gaining some pleasure to

22  past chapters of his life in order to let the

23  sun rays of the future shine in. My wife and I

24  have reconfirmed our belief that we are willing

25  to provide a stable and loving home to Mr.

26  McClore, also, we can offer him employment in my

27  thriving ground maintenance business. We truly

20

1  believe in (Indiscernible) second chances and we

2  are ready and willing and able to help and

3  assist Mr. McClore re-enter society and become a

4  productive member. It says that they believe you

5  are rehabilitated and ready to be released. Now,

6  how do you know them?

7      INMATE MCCLORE: (Indiscernible) in the

8  visiting room.

9      PRESIDING COMMISSIONER FISHER: Were they

10  here on a prison ministry kind of thing?

11      INMATE MCCLORE: Well, she was coming to

12  visit somebody, she was coming to visit her

13  husband.

14      PRESIDING COMMISSIONER FISHER: Oh. Okay.

15  And I have a letter here that apparently is

16  signed by several members of your family.

17      ATTORNEY RUTLEDGE: You don't have to read

18  that one.

19      PRESIDING COMMISSIONER FISHER: I'm

20  looking for another job offer, or was that the

21  one you were talking about?

22      ATTORNEY RUTLEDGE: Right. That one of the

23  beauty salon would be relevant.

24      PRESIDING COMMISSIONER FISHER: And who is

25  that from?

26      INMATE MCCLORE: Caroline.

27      PRESIDING COMMISSIONER FISHER: Here it

21

1   is. And that is Luissaint, it says, "upon Mr.

2   McClore's release, he would be provided with

3   food, shelter, transportation, clothing and all

4   the technologies that have been developed over

5   the years of his incarceration. This offer is

6   available to him for as long as he needs. It and

7   for gainful employment, this offer will not

8   expire," I guess is what it's supposed to say.

9   "until I'm assured that Mr. McClore will not be

10  a burden to anyone and his adjustment into

11  society is full and complete." Okay. All right.

12  I do have a letter here from the Los Angeles

13  Police Department. They wrote in response to

14  3042 notices. I have multiple copies of that.

15  Mr. McClore, before we move on, is there

16  anything about anything of the areas that I've

17  covered with you that you feel that we haven't

18  covered adequately?

19          **INMATE MCCLORE**: No, you got it.

20          **PRESIDING COMMISSIONER FISHER**: Okay. All

21  right, then if you will turn your attention to

22  Commissioner McBean, she's going to go through

23  your post-conviction factors with you.

24          **DEPUTY COMMISSIONER MCBEAN**: Okay. Very

25  good. I was struggling over here because I

26  couldn't find a lot of things that were written

27  about, and then I found there was another file I

22

1   wasn't looking at, so -- Now Mr. McClore, in

2   this phase of the hearing we'll be looking at

3   your institutional adjustment and I've read the

4   Central File, the Board Report, the Psych

5   Evaluation and if I miss anything,  I'll give

6   you and your attorney an opportunity to add

7   something. I see you last appeared before the

8   Board on 10-23-03, at that time, you were given

9   a one-year denial. And you were asked to remain

10  disciplinary free and to participate in self-

11  help and therapy. You have a current

12  classification score of 19, your custody level,

13  Medium A. Now, you're still working as the

14  photographer in Visiting?

15       INMATE MCCLORE: Yes.

16       DEPUTY COMMISSIONER MCBEAN: Okay. And it

17  looks like you've been doing that since '02 and

18  doing very well, you have above average work

19  reports, prior to that time, you worked as a

20  Porter?

21       INMATE MCCLORE: Yes.

22       DEPUTY COMMISSIONER MCBEAN: Okay. Just

23  going back to 2000, you do have a GED and what

24  year did you acquire that?

25       INMATE MCCLORE: What year? Had to be

26  around '89 I believe.

27       DEPUTY COMMISSIONER MCBEAN: Okay. I can

23

1   verify that, I believe it's in this second file.

2   (Indiscernible) Score, 9.3 and from an academic

3   standpoint, I saw that you participated in some

4   business classes back in 1996 as well. Is that

5   right?

6           **INMATE MCCLORE:** Yes.

7           **DEPUTY COMMISSIONER MCBEAN:** Any other

8   academic upgrades?

9           **INMATE MCCLORE:** I think that would be in

10  the file --

11          **DEPUTY COMMISSIONER MCBEAN:** Just tell me

12  what they are, did you do anything else, have

13  you acquired a college degree or done any

14  correspondence work academically?

15          **INMATE MCCLORE:** No. Until they took

16  college out of prison, I was going to college,

17  then they took it away.

18          **DEPUTY COMMISSIONER MCBEAN:** I know they

19  did. So how long did you attend college classes

20  in prison before they took it away?

21          **INMATE MCCLORE:** I think, not even a year

22  I don't think.

23          **DEPUTY COMMISSIONER MCBEAN:** Now let's

24  see, from a vocational standpoint, you did

25  complete mill and cabinet, is that right?

26          **INMATE MCCLORE:** Yes.

27          **DEPUTY COMMISSIONER MCBEAN:** And also, you

24

1  did complete the Graphics Arts Print Design
2  Program in 2000 and looked like you participated
3  in upholstery in '99 as well, did you complete
4  that one?
5          INMATE MCCLORE: I don't remember that.
6          DEPUTY COMMISSIONER MCBEAN: Didn't look
7  like you were in it very long. So you have
8  completed two vocational trades?
9          INMATE MCCLORE: Yes.
10         DEPUTY COMMISSIONER MCBEAN: All right.
11 Looking at -- what self-help have you
12 participated in since your last appearance in
13 '03?
14         INMATE MCCLORE: I tried to get in the
15 self-help program, I have a chrono -- it was
16 going to be triple C, it was going to be anger
17 management, I've been taking courses of that.
18         DEPUTY COMMISSIONER MCBEAN: You've taken
19 Anger Management?
20         INMATE MCCLORE: Well, I took two courses,
21 I completed and then I was going to take another
22 one, but they wouldn't let me because they said
23 I'm not a triple C.
24         DEPUTY COMMISSIONER MCBEAN: Right. So
25 since '03, have you been doing any self-help at
26 all?
27         INMATE MCCLORE: No.

1    **DEPUTY COMMISSIONER MCBEAN:** Okay. I can

2  see that your not Triple CMS and you never have

3  been, right?

4    **INMATE MCCLORE:** Right.

5    **DEPUTY COMMISSIONER MCBEAN:** I see that

6  you did the impact program in '02, looks like

7  you were in AA/NA from '96 to 2000, did a life

8  skills program with Dr. Bateman, and some one-

9  on-one counseling with Dr. Bateman, I saw that

10  you read some self-help books in '02.

11    **INMATE MCCLORE:** Yes.

12    **DEPUTY COMMISSIONER MCBEAN:** That goes

13  back as far as 2000 and before that you had done

14  some other things, did some Muslim sponsored

15  programs, participated in a Rock Program, what

16  is that?

17    **INMATE MCCLORE:** It's like a scared-

18  straight program. That was at Corpus State

19  Prison.

20    **DEPUTY COMMISSIONER MCBEAN:** Okay. And you

21  did some science of mind courses.

22    **INMATE MCCLORE:** Yes.

23    **DEPUTY COMMISSIONER MCBEAN:** Okay. But

24  since your last appearance, you haven't been

25  successful in participating in anything.

26    **INMATE MCCLORE:** Right. Because they don't

27  really have anything here that you can take when

26

1  you get ready to take, you know.

2      DEPUTY COMMISSIONER MCBEAN: Are you on

3  some waiting list, or something like that?

4      INMATE MCCLORE: Right.

5      DEPUTY COMMISSIONER MCBEAN: Are you?

6      INMATE MCCLORE: No, not right now.

7      DEPUTY COMMISSIONER MCBEAN: I didn't see

8  Anger Management in the file, have you done

9  Anger Management?

10      INMATE MCCLORE: Yes, I did a book report

11  and also in the impact, there's a chrono in

12  there has some anger management in there.

13      DEPUTY COMMISSIONER MCBEAN: True, I know

14  that, it's in Impact. Did you do a separate

15  stand alone Anger Management Program somehow?

16      INMATE MCCLORE: No, that's what the

17  Triple C won't let me --

18      DEPUTY COMMISSIONER MCBEAN: Right. So

19  this Anger Management is part of Impact?

20      INMATE MCCLORE: Right.

21      DEPUTY COMMISSIONER MCBEAN: Okay.

22      INMATE MCCLORE: And the book course I

23  took with Dr. Causewell.

24      DEPUTY COMMISSIONER MCBEAN: You mean the

25  reading of self-help books in '02?

26      INMATE MCCLORE: Right, exactly.

27      DEPUTY COMMISSIONER MCBEAN: Very good.

27

1    From a disciplinary standpoint, you have six

2    115s between 1985 and 1997, your last one was on

3    3-6-97 for failing to participate, the others

4    are for things like being out of bounds,

5    refusing to perform duties, destroying State

6    property, home brew in cell, that was way back

7    in '87, two for home brew in cell, modernly we

8    call it Pruno. That was your forno, so to speak?

9         **INMATE MCCLORE:** Yea.

10        **DEPUTY COMMISSIONER MCBEAN:** Did you make

11   that Pruno.

12        **INMATE MCCLORE:** No, I didn't.

13        **ATTORNEY RUTLEDGE:** Oh, I would note that

14   two of his 115s were when he was serving his

15   prior term, the one's in '85, that was when he

16   was serving the term for burglary.

17        **PRESIDING COMMISSIONER FISHER:** Life term

18   started 4-6-87, so that good, we'll say there

19   are four 115s then.

20        **DEPUTY COMMISSIONER MCBEAN:** Now there was

21   one in '94 for assault and battery causing GBI

22   any comments you want to make about that one?

23   That's a pretty serious 115, looks like you got

24   a SHU term for that.

25        **INMATE MCCLORE:** I didn't do a SHU term.

26        **DEPUTY COMMISSIONER MCBEAN:** It was

27   assessed and suspended.

28

1       INMATE MCCLORE: Yes.

2       DEPUTY COMMISSIONER MCBEAN: What happened

3   there?

4       INMATE MCCLORE: Well, me and another

5   individual has got to a misunderstanding, so he

6   jumped me on the yard, and I was defending

7   myself in the fight. The officer shot a warning

8   shot for us to lay on the ground, I lay on the

9   ground, and while I was laying on the ground the

10  officer still shot me, so later on, it was

11  determined later that I was wrongly shot in that

12  incident.

13      DEPUTY COMMISSIONER MCBEAN: Okay. The 115

14  say you fell to the ground and continued to

15  fight while on the ground and that's why you

16  were shot.

17      INMATE MCCLORE: Exactly, but I got some--

18      ATTORNEY RUTLEDGE: Mr. McClore has a

19  letter that I've seen from the -- like when you

20  write a letter because -- you need prosthesis?

21      INMATE MCCLORE: Yes.

22      ATTORNEY RUTLEDGE: And they granted him

23  that, they state in the letter that he was

24  accidentally shot, that's the basis of his

25  comment on that.

26      DEPUTY COMMISSIONER MCBEAN: Is that how

27  your leg got injured and you've been required to

1   use a cane since then, this was the shooting you

2   were looting to earlier?

3       **INMATE MCCLORE:** Right.

4       **DEPUTY COMMISSIONER MCBEAN:** Okay. Were

5   you shot with less-than-lethal, or were you shot

6   with a bullet?

7       **INMATE MCCLORE:** A bullet.

8       **DEPUTY COMMISSIONER MCBEAN:** You were shot

9   in the thigh.

10       **INMATE MCCLORE:** Yes.

11       **DEPUTY COMMISSIONER MCBEAN:** Okay. That's

12   the only 115 that I saw for any kind of violent

13   behavior and you have no 128s on this term. Is

14   that right?

15       **INMATE MCCLORE:** Right.

16       **DEPUTY COMMISSIONER MCBEAN:** All right.

17   Let's look at the psych evaluations here, your

18   most recent psych eval, 10-7-03, by Dr. S.

19   Sexton, no contributory clinical disorder on

20   Axis 1, and adult anti social behavior history

21   only on Axis 2. Dr. States inmate's McClore's

22   parole progress is excellent, there's virtually

23   no indicator's suggesting otherwise. He has

24   participated in virtually every activity of

25   self-help offered in the institution over the

26   years of his incarceration. Is that true?

27       **INMATE MCCLORE:** Yes.

30

1    DEPUTY COMMISSIONER MCBEAN: You mean,

2    here at Soledad? Or wherever you've been?

3        INMATE MCCLORE: Here at Soledad, I've

4    been here almost 8 years, 7 years.

5        DEPUTY COMMISSIONER MCBEAN: You've done

6    every self-help program that there is?

7        INMATE MCCLORE: I wouldn't say that there

8    is, I would say that I tried to get into, that's

9    available that can help me, yes.

10        DEPUTY COMMISSIONER MCBEAN: Okay. The

11    things that you tried to get into, you were

12    successful at getting into. Okay. He says you've

13    made excellent use of incarceration time, gained

14    very invaluable knowledge and that he did not

15    previously possess, there are no additional

16    self-help groups or services provided by the

17    psychology department of the institution that

18    has anything more to offer this inmate. He's

19    already used them wisely and has made great

20    strides in his personal development. Now, what

21    kinds of drugs and alcohol -- what kind of drugs

22    did you say you have used in the past before

23    this prison term?

24        INMATE MCCLORE: I never used no drugs.

25        DEPUTY COMMISSIONER MCBEAN: Never used

26    drugs? Never used alcohol?

27        INMATE MCCLORE: Only for social

31

1   occasions, like once or twice, not -- I don't

2   really drink much.

3        **DEPUTY COMMISSIONER MCBEAN:** Okay, he

4   notes you have also had several laudatory

5   chrono's from Correctional Officer Bann, which I

6   also noticed in the Central file, commending you

7   for your interaction with staff and inmates and

8   indicating it's always been very respectful and

9   demonstrating an outward air of likeability for

10  those he comes in contact with or has the

11  slightest interaction with. "And it is my

12  opinion that once introduced back into society

13  through parole, he will continue to demonstrate

14  those qualities and maturity, responsibility and

15  empathy necessary to fulfill his role as a law-

16  abiding and productive citizen." So, in terms of

17  dangerousness, he says given all the information

18  above, it's the clinicians opinion this inmate

19  poses a considerably lower degree of threat than

20  the average level 2 inmate and if released to

21  the community, the inmate poses no more threat

22  of violence or dangerousness than any other

23  citizen in the community. Okay. Was there

24  anything else you wanted to add in terms of your

25  accomplishments or institutional adjustment I

26  may have missed?

27        **INMATE MCCLORE:** No.

32

1    **DEPUTY COMMISSIONER MCBEAN:** Okay.
2    Anything you want to add Counsel?
3    **ATTORNEY RUTLEDGE:** No.
4    **DEPUTY COMMISSIONER MCBEAN:** Okay, let me
5    turn to the Chair.
6    **PRESIDING COMMISSIONER FISHER:** What
7    happened at your hearing last year? You and
8    Commissioner Harmon kind of had words at the end
9    of the hearing. He referred to it as you having
10   a little fit.
11   **INMATE MCCLORE:** To be honest with you,
12   and I apologize for that, because I did. Because
13   I'm ready to go home. I really, am ready to go
14   home because I accept full responsibility, I
15   have much remorse for what I done, because I
16   know the mental trauma I sent this victim
17   through and I will never want to be a victim
18   like that myself, so, that's what it was. That
19   was totally on me, and I apologize for it.
20   **PRESIDING COMMISSIONER FISHER:** What was
21   it about?
22   **INMATE MCCLORE:** I don't mean no
23   disrespect, I'm going to be just straight
24   forward with it, whenever I'm denied to go home,
25   it's real painful. And because I know when it
26   come to a one-year denial, two-year denial,
27   three-year denial, four-five-year denial, they

33

1    always go past that. I never came back, at no

2    time was I suppose to come back. Like right now,

3    I supposed to come back to the parole board the

4    2004, on a two-year denial, so that bothers me

5    because I already know when I hear that one-

6    year, there's no such thing. So that's what it

7    was.

8        PRESIDING COMMISSIONER FISHER: Okay. I

9    don't have any questions, do you have anything?

10        DEPUTY COMMISSIONER MCBEAN: What's going

11   to prevent you from committing another crime

12   like this in the future?

13        INMATE MCCLORE: Stand spiritually

14   grounded and making sure I have respect for

15   other people and being more sensitive to other

16   people needs and wishes and being with my family

17   and getting me a job and staying straight.

18        DEPUTY COMMISSIONER MCBEAN: That's my

19   only question.

20        PRESIDING COMMISSIONER FISHER: Counsel?

21        ATTORNEY RUTLEDGE: Just a quick question

22   Mr. McClore, how is it that before you weren't

23   into working, what did you learn in prison, you

24   said you need to get a job. Explain that part,

25   what's the importance of getting a job?

26        INMATE MCCLORE: Being independent, and

27   then being able to do what I want to do, making

1    my own money, staying out of crime and not never

2    ever going down that avenue again.

3        **ATTORNEY RUTLEDGE:** Okay. No further

4    questions for Mr. McClore.

5        **PRESIDING COMMISSIONER FISHER:** All right.

6    Would you like to close?

7        **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Yes.

8    It's the position of the District Attorney's

9    office that we oppose the finding of

10   suitability. Looking at the inmate's record, he

11   was sentenced to stay prison, paroled, while he

12   was on parole, he committed another crime, went

13   back to prison, and then he committed this crime

14   after that and thinking of the circumstances of

15   this crime, I compare it to a murder victim --

16   it's final for a murder victim, it's all over,

17   but looking at the probation report and Miss

18   Bushay's (phonetic) statement that she made at

19   the time, she said that she had suffered a great

20   deal of mental distress as a result of this

21   offense. And that she hopes that both the

22   defendant's are in for a long time and she is

23   fearful for her safety when they are released,

24   which means that for the rest of her life, she

25   is going to be looking over her shoulder, not

26   only at these two defendant's if they are

27   released, but she is afraid of her safety when

35

1  she's out in public and I think that's a

2  horrible thing to put on anybody. And those are

3  the reasons that I oppose the suitability, just

4  on the crime itself.

5          **PRESIDING COMMISSIONER FISHER:** Thank you.

6  Counsel?

7          **ATTORNEY RUTLEDGE:** I was asking Mr.

8  McClore about the job thing, he basically came

9  to the correctional system as a punk. Someone

10  who just, who thought the way to get money was

11  to take it from other people. The man that I met

12  here, preparing for his hearing isn't the same

13  person reflected in the parole reports. He's

14  participated in self-help, he has maintained his

15  family contacts, he's a very successful worker

16  in the visiting room, interacting with other

17  people, that shows in itself, a desire to work,

18  to do something useful other than sit in here

19  and think of ways to hustle, he's actually been

20  very productive in prison. He has worked, done

21  numerous vocations, got his, GED completed a

22  short amount of college, he has no substance

23  abuse issues according to his records, he's kept

24  in contact with his son's, he sends them money.

25  He completed the Rock Program, Life Skills,

26  individual therapy, he's done four years of NA

27  and AA, self-help books, the IMPACT Program, two

36

1    sections on anger management, I would note that
2    on the behavioral side, his rules violation in
3    '94 which was 11 years ago, 11 years ago, I
4    think he may not have gotten a SHU term, but he
5    got shot in the leg, I mean, I definitely see
6    that he learned from that, we haven't had any
7    type of violence or anything like that since
8    then. And I would note to his chrono that he has
9    from Correctional Officer Bann, who says he's
10   been a correctional officer for 17 years and
11   that Mr. McClore demonstrates a high degree of
12   maturity and responsibility in dealing with the
13   stresses, tensions and problems with this prison
14   environment. It is my opinion that once re-
15   introduced back into society through parole, he
16   was continue to demonstrate the qualities of
17   maturity and responsibility necessary to fulfill
18   his role as a productive citizen and I think
19   that underlines what I'm saying before. Here is
20   a man who took the tools of the system and used
21   them to turn himself, to transform from punk
22   into a man who's going to be a productive member
23   of society. And I would note this crime, not at
24   all to undercut how this would have affected the
25   victim, there was no life taken, and Mr. McClore
26   didn't have any type of a weapon or harm, it was
27   kind of a goofy crime, really. A display of his

37

1   true ignorance at the time. And I think in the

2   psych report and in previous psych reports, as

3   far as his remorse goes, he taken his

4   responsibility, he seems to have insight on his

5   behavior on the victim. He, at that time, in his

6   ignorant thinking, he thought if we don't hurt

7   the person, we haven't hurt them, but now he

8   realizes that their behavior did in fact

9   traumatize the victim. And I'm quoting for that

10  he's extremely remorseful and apologetic. So we

11  have one officer saying that he's ready to go

12  into society, and also in the conclusion of the

13  psych report is just overwhelmingly for parole.

14  Every item on the last page of the '03 psych

15  report supports him being paroled. I would note

16  too, that in previous hearings, it's always been

17  stated that he has stayed disciplinary free and

18  use self-help, which I believe he's done. Also,

19  in a previous hearing, they asked him to firm up

20  his parole plans, which he's also done. He's

21  even taken the time to contact the Board of

22  Parole Hearings for any additional resources

23  that he could utilize. And he commented to me

24  when he heard there was a letter in his file, he

25  said, "you know, I really don't want to be in

26  L.A. I will go there because that's where I have

27  to start, but as soon as I can, I'll probably go

38

1    to Tennessee, if the L.A. PD doesn't want me

2    there, I don't want to give them any trouble,

3    I'll just go to Tennessee," So, some people

4    would feel offended by that, but he seems to

5    take it in stride and want to cooperate with

6    that. So, I would ask the Board, based upon all

7    that information, to give Mr. McClore a parole

8    date at this time.

9          **PRESIDING COMMISSIONER FISHER:** Thank you.

10   Mr. McClore, would you like to add anything?

11         **INMATE MCCLORE:** No. I think she did good.

12         **PRESIDING COMMISSIONER FISHER:** All right.

13   We'll go ahead a recess then.

14                       **R E C E S S**

15                        --o0o--

16

17

18

19

20

21

22

23

24

25

26

27

39

1       **CALIFORNIA BAORD OF PRISON TERMS**

2               **D E C I S I O N**

3       **PRESIDING COMMISSIONER FISHER:** All right. I

4   note for the record that everyone that was previously

5   in the room and identified themselves have returned to

6   the room. Mr. McClore, I'm going to cut to the chase

7   here. This is another one-year denial and I'm going to

8   be real specific with you as to why. The Panel

9   reviewed all the information received from the public

10  and relied on the following circumstances in

11  concluding the Mr. McClore is not yet suitable for

12  parole and would pose an unreasonable risk of danger

13  to society or a threat to public safety if released

14  from prison. This case was the kidnapping of Miss

15  Krista Boucher who was forced into her car and forced

16  to turn over money and to, in fact, actually shop for

17  her two kidnappers. Mr. McClore, we went back through

18  the transcripts of your prior hearings and there are

19  two major things that really came out at us. The first

20  one is the fact that you just seem kind of flipped

21  about talking about your offenses, you know, and it

22  may just be because you've talked about them a lot,

23  it's hard to say. But it doesn't feel to us that you

24  have a lot of insight as to why you were doing the

25  things you were doing or into how your crimes affected

26  other people. The other thing that really troubled

27  **WILBUR MCCLORE    C-50493    DECISION PAGE 1    9-12-05**

```
 1  both of us was the fact that in the '96, '98, '99, '02
 2  and 2003 hearings, at the end of the hearings, all of
 3  the Commissioners made comments about your reaction.
 4  And that concerns us. Don't do it again, because if
 5  you do it again, because if you do it here, I
 6  guarantee you the next person reading the transcript
 7  of this hearing is going to bring it up again. It
 8  gives us pause. It gives us pause that in '96 you
 9  walked out. In '98, the Commissioner referred to
10  having temper tantrums; in '99 you argued with the
11  Commissioner; in 2002 you argued with the
12  Commissioner; in 2003, Commissioner Harmon referred to
13  you throwing a fit. Now, you're chuckling, but here's
14  the thing, we don't see that kind of behavior and give
15  you a 115, but I have to tell you that, to any Panel,
16  is going to be a red flag. I'm going to suggest this
17  to you, I want you to, over the course of next year,
18  and we are working very hard to clear up the back log,
19  we haven't even come up with a way to do it, so
20  hopefully you'll be back here in year, I want you to
21  go through the transcripts of not just your commitment
22  offense, but the transcripts that we have in here, the
23  information about the assault with deadly weapon. I
24  want you to go through those, I want you to really go
25  through your Central File and come back in prepared to
26  talk about, other than, you fell in with bad company,
27  WILBUR MCCLORE   C-50493   DECISION PAGE 2   9-12-05
```

41

1   or you went through a bad patch and talk about what

2   kind of insight you developed as to why you were

3.  behaving the way you were behaving and what's

4   different about you now. And if you can't get into an

5   Anger Management Program in the institution, do

6   something on your own, okay. Because you coming in

7   here at the end of your hearings and throwing a temper

8   tantrum as was referred to by multiple Commissioners,

9   is not going to do you any good. It just makes you

10  look bad and for the most part, you've conducted

11  yourself really well in this hearing and you seem to

12  be conducting yourself well in the institution, but if

13  certain things set you off, we have to be worried

14  about that. So, I'm giving you the best advice I can

15  here. I -- you're doing a good program, you haven't

16  done as much work since your last hearing as you were

17  doing before, and I know that there's been a shortage

18  of programs. I really want to encourage you to do some

19  work on your own so that you can come back here loaded

20  with the self-help and just come back looking really

21  good instead of (Indiscernible). All of the

22  Commissioners agreed with the prior decisions, they

23  all do. So, when you do stuff like that, it raises

24  people's (Indiscernible). This was a crime where

25  nobody was dead, nobody got hurt, it was a bad crime

26  and you had prior prison terms, but you ought to be

27  **WILBUR MCCLORE    C-50493    DECISION PAGE 3    9-12-05**

42

1  able to get out of prison. You just need to do those

2  things and first of all, I hope that you're back here

3  on exactly the same date next year as you are today

4  and that you'll come back having considered seriously

5  what I just told you. And this completes the decision.

6  Do you have any comments?

7      **DEPUTY COMMISSIONER MCBEAN:** Yea. I couldn't

8  agree more and I think Commissioner Fisher really said

9  it well, and I hope that you heard her words. The only

10 thing that I wrote down, she was trying to question

11 you about your level of insight and why you committed

12 the crime, you said you didn't use drugs, I noticed

13 some reference in the past of experimentation with

14 marijuana, that is in the prior transcripts, we do

15 count that, but what you said was, "I was just

16 stressing". That is all I heard from you in terms of

17 insight as to why you did this crime. You know,

18 hanging out with the wrong people and you were just

19 stressing, you weren't under the influence, you

20 weren't using drugs, and you stress in these hearings,

21 as has been pointed out. You had to be shot in '94 to

22 get you to stop fighting. So, all that kind of adds up

23 to, you need to be able to better understand what got

24 you there and be able to better discuss it here and to

25 be able to handle the decisions made about you when

26 you don't like them, which is what I think we're

27 **WILBUR MCCLORE    C-50493    DECISION PAGE 4    9-12-05**

43

1   seeing consistently over the years, at the Board. We

2   know you want to get out of prison, we understand

3   that, but you need to be able to handle the things

4   that don't go your way in life without stressing and

5   hurting somebody or hurting yourself in the process,

6   which is what you do when you come here and you don't

7   handle it well. So, she gave you excellent advice, I

8   couldn't agree more, you've done zero self-help since

9   your last hearing and that's not a good thing either.

10  You need to be doing something to get into anything

11  and everything that you can because, don't tread water

12  and think, okay, I've done enough and that's all I'm

13  going to do, that's not a good thing either. You need

14  to get out there and find something, get involved in

15  it and try to gain everything you can to gain as much

16  insight as you can. Because no one's ever done

17  growing, and that includes us. Okay. Well, good luck

18  to you sir.

19          **PRESIDING COMMISSIONER FISHER:** One more thing,

20  I just want to plant a seed here Mr. McClore and that

21  is that, when the Panel finds you suitable, you're

22  going to have to pass mustard at the Governor's desk

23  and he's going to be reading these decisions too. They

24  will pick apart everything, so you just want to be the

25  best package you can be, and because of these comments

26  that have been made in the past, you really want to do

27  **WILBUR MCCLORE   C-50493   DECISION PAGE 5   9-12-05**

44

1    whatever you can over the next 12 months to counter

2    act that. Because all you are when you hit his desk is

3    a file. He doesn't have an opportunity to sit across

4    the table and talk to you like the Commissioners do,

5    so -- and certainly that has nothing to do with

6    whether a Panel finds you suitable, but I think it's a

7    shame when a Panel does find an inmate suitable who

8    really has done a good job, if there's something that

9    they haven't been able to address on paper and the

10   Governor sends it back. So I just want you to be

11   thinking about that and doing what you need to do for

12   yourself and to dot all the I's and cross all the t's.

13   And I think your close. All right. Good luck sir.

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED FOR 1 YEAR.**

24   **THIS DECISION WILL BE FINAL ON: <u>Jan 10, 2006</u>**

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,**

26   **THE DECISION IS MODIFIED**

27   **WILBUR MCCLORE    C-50493    DECISION PAGE 6    9-12-05**

45

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, TIFFANY BILLINGSLY, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 44, and which recording was duly recorded at VALLEY CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF WILBUR McCLORE, CDC NO. C-50493, ON SEPTEMBER 12, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated SEPTEMBER 19, 2005, at Sacramento, California.

Tiffany Billingsly
TIFFANY BILLINGSLY
TRANSCRIBER
**PETERS SHORTHAND REPORTING**